**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MIRNA RUBIDIA ARTIGA CARRERO,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CIVIL NO. JKB-16-3939** |
| **CHRISTOPHER FARRELLY, et al.,** | * | |
| **Defendants.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM

Mirna Rubidia Artiga Carrero ("Plaintiff") filed a five-count complaint against various state and federal officials and entities seeking declaratory and injunctive relief, compensatory damages, and punitive damages stemming from her alleged unlawful arrest in 2014, which she contends was caused in part by federal policy regarding the identification and apprehension of aliens, like her, that are subject to a final order of removal. Pending before the Court is a motion to dismiss Counts 1 and 2 pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative for summary judgment, filed by Defendants Christopher Farrelly and Baltimore County (the "State Defendants"). Also before the Court is a motion to dismiss Counts 3 through 5 pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, filed by Defendants the United States of America; Jefferson B. Sessions III, Attorney General of the United States; John F. Kelly, Secretary of the U.S. Department of Homeland Security ("DHS"); and Thomas D. Homan, Acting Director of Immigration and Customs Enforcement ("ICE") (the "Federal Defendants"). The motions have been fully briefed (ECF Nos. 13, 24, 27, and Nos. 28, 31, 32), and no hearing is required, Local Rule 105.6 (D. Md. 2016). For the reasons set forth

below, the State Defendants' motion will be denied and the Federal Defendants' motion will be granted in part and held in abeyance in part.

## I.  *Background*

Plaintiff is a citizen of El Salvador residing in Maryland.  She originally entered the United States in 2005, at which time she was apprehended by United States Border Patrol and served a Notice to Appear before an immigration judge.  In February 2006, Plaintiff failed to appear for her scheduled hearing and an order of removal was entered against her in absentia. Sometime shortly thereafter, ICE officials entered a civil warrant of removal for Plaintiff in the National Crime Information Center ("NCIC") database.

The NCIC is an electronic database hosted by the Federal Bureau of Investigation ("FBI") and accessed daily by federal, state, and local law enforcement.  The NCIC contains extensive criminal and civil identification records that are divided into twenty-one categories or "files."  The database includes records of stolen property (e.g., boats, guns, license plates, vehicles) and records of persons (e.g., arrest records, wanted persons, sex offenders, gang members).  One such file is the "Immigration Violator File," which includes records of aliens, like Plaintiff, with outstanding civil warrants of removal.

Throughout much of its history, the NCIC database did not include identification information for individuals with outstanding civil immigration warrants.  This decision was based on FBI policy that limited "use of the NCIC Wanted Person File only to those persons for whom warrants have been issued and who may be arrested by *any law enforcement officer with the power to arrest*."  (Compl. Ex. 7, ECF No. 1-7, Memorandum for Joseph R. Davis, Assistant Director – Legal Counsel FBI, from United States Department of Justice Office of Legal Counsel, at 1 (April 11, 1989) (emphasis added).)  Because state and local law enforcement

officers "are not authorized to execute INS warrants of arrest," *id.* at 2 n.3, individuals subject to such warrants cannot be arrested "by any law enforcement officer with the power to arrest," *id*. at 1. Therefore, the memorandum concluded that civil warrants of removal could not be included in the NCIC database consistent with FBI policy. The OLC reaffirmed this view in a subsequent memorandum issued in 1996. (ECF No. 1-8, Memorandum Opinion for the United States Attorney Southern District of California (Feb. 5, 1996).) However, in late 2001 and early 2002, the Department of Justice, through its then-subordinate agency the Immigration and Naturalization Service, shifted course and began to include records of individuals with outstanding civil warrants of removal in the NCIC. Plaintiff is one such individual.

## II.  *Allegations of the Complaint*[1]

On August 26, 2014, at approximately 12:30 a.m., Plaintiff was driving home with her sister after completing her shift at a fast food restaurant. She came to a stop at a red light next to a Baltimore County police patrol car driven by Defendant Officer Farrelly. Plaintiff alleges that Officer Farrelly turned to look at her and observed that she was Latina. After both vehicles proceeded through the intersection, Officer Farrelly moved into the right lane behind Plaintiff and activated his signal lights for her to pull over. Plaintiff stopped immediately. Officer Farrelly approached the vehicle and asked for her driver's license and proof of insurance, and Plaintiff provided her license which was marked "Not Acceptable for Federal Purposes." (ECF No. 1 ¶ 20.)[2]

---

[1]    Considering that this Memorandum evaluates a Rule 12 motion to dismiss, the Court here summarizes the allegations as presented by Plaintiff in her complaint. *See, e.g.*, *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Where indicated, the Court supplements these allegations with evidence from outside the pleadings, as is permitted when assessing a factual challenge to jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

[2]    According to Plaintiff, "[t]hat notation is reserved for driver's licenses issued to individuals who are not able to provide proof of lawful immigration status to the Maryland Motor Vehicle Administration." (ECF No. 1 ¶ 20.)

Approximately ten minutes later, Officer Farrelly returned to Plaintiff's vehicle and informed her that he had stopped her because she did not have insurance. However, Plaintiff had valid insurance for the vehicle at the time of the stop. Officer Farrelly then went back to his vehicle. During one of his trips to his vehicle Officer Farrelly entered Plaintiff's identification information in the NCIC database, which revealed that she had an outstanding civil warrant of removal but no criminal record. Ten more minutes passed and Officer Farrelly again approached Plaintiff's car and, without mentioning her insurance, asked her a series of questions regarding her immigration status. After questioning Plaintiff about her family and immigration history, Officer Farrelly stated that he "had to arrest her" and needed to "investigate her situation further and . . . get more information." (ECF No. 1 ¶ 25.)

Officer Farrelly placed Plaintiff in the back of his patrol car and transported her to the Howard County Detention Center in Jessup, Maryland. During the ride, Officer Farrelly used his cell phone to call someone who appeared to be instructing him to bring Plaintiff to the detention center. Officer Farrelly and Plaintiff arrived at approximately 2 a.m. and were met in the parking lot by an ICE agent who took custody of Plaintiff and placed her in handcuffs. After being processed in Baltimore the next day, Plaintiff was taken to an immigration facility in Snow Hill, MD, where she remained for six weeks.

Plaintiff alleges five causes of action stemming from the entry of her information in the NCIC database and her subsequent seizure based on that information. She brings two claims against the State Defendants pursuant to 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978):

- Count 1 – unreasonable seizure in violation of the Fourth and Fourteenth Amendments; and

- Count 2 – discrimination on the basis of race (and/or national origin) in violation of the Fifth and Fourteenth Amendments.

Her remaining three claims implicate only the Federal Defendants. First, she seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, alleging that she is at imminent risk of suffering an unlawful seizure in the future in violation of the Fourth Amendment (Count 3) and that the individual Federal Defendants have exceeded their statutory authority by including civil warrant information in the NCIC database (Count 4). Specifically, she seeks a declaration "that the federal defendants' policy and practice of entering and disseminating civil immigration information to state and local law enforcement officials through the NCIC database is not authorized by statute," and an injunction prohibiting the Federal Defendants "from maintaining a record of [her] civil immigration information in the NCIC database," and ordering "its immediate expungement from that database." (ECF No. 1 at 17.) Finally, Plaintiff seeks damages against the United States pursuant to the Federal Tort Claims Act ("FTCA"), alleging that the federal government caused her to be falsely arrested and imprisoned (Count 5).

## III.  Standard of Review

### A.  Standard for Dismissal under Rule 12(b)(1)

The Plaintiff bears the burden of proving subject-matter jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *see also Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (noting challenge may be either facial, i.e., complaint fails to allege facts upon which subject-matter jurisdiction can be based, or factual, i.e., jurisdictional allegations of complaint are not true); *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) ("When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff."). In the case of a factual challenge, it is permissible for a district court to "consider evidence

outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg*, 945 F.2d at 768 (citing *Adams*, 697 F.2d at 1219). A challenge to a plaintiff's standing "implicates th[e] court's subject matter jurisdiction." *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230 (4th Cir. 2008).

### B.    Standard for Dismissal under Rule 12(b)(6)

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. An inference of a "mere possibility of misconduct" is not sufficient to support a plausible claim. *Id*. at 679. However, "a well–pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556. Even so, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

## IV.   Analysis

### A.    The State Defendants' Motion to Dismiss

Plaintiff alleges that Officer Farrelly violated her constitutional rights when he stopped, detained, and ultimately arrested her. More specifically, she contends that Officer Farrelly initially stopped her solely because she appeared to be Latina. Further, she alleges that even if

the initial stop was justified, Officer Farrelly unreasonably prolonged the stop solely in order to investigate her immigration status. Plaintiff argues that both the initial stop and subsequent detention violated her Fourth and Fifth Amendment rights. Moreover, she contends that Baltimore County is liable under *Monell* because it failed to adequately train Officer Farrelly.

The State Defendants put forth a number of arguments in support of their motion to dismiss. First, they contend that the Complaint fails to state a claim against Officer Farrelly or the County because: (1) Plaintiff does not allege she is a "citizen of the United States or other person within the jurisdiction thereof," (State Def.'s Mot., ECF No. 13 at 1); (2) Plaintiff fails to allege that the State Defendants caused her injury; and (3) Officer Farrelly was acting under color of federal—not state—law when he stopped and arrested Plaintiff. Furthermore, the State Defendants offer two individual defenses: (1) the County provided adequate training, and therefore it is not liable under *Monell*; and (2) Officer Farrelly is entitled to qualified immunity. In addition, the State Defendants refute many of the material allegations in Plaintiff's Complaint and argue in the alternative that the Court should grant summary judgment in their favor. The Court declines to consider these materials and convert the motion into one for summary judgment.[3] Rather, taking the allegations in the Complaint as true and drawing all reasonable

---

[3]    The State Defendants proffer several documents in support of their alternative motion for summary judgment, including an affidavit by Officer Farrelly, documents from the Maryland Motor Vehicle Administration allegedly indicating that the registration for the vehicle Plaintiff was driving was suspended, and documents from Baltimore County purporting to show it trained Officer Farrelly regarding the detention of aliens. "A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure," *Sager v. Hous. Comm'n*, 855 F. Supp. 2d 524, 542 (D. Md. 2012), which provides that "[i]f, on a motion under Rule 12(b)(6) . . ., matters outside the pleadings are presented to *and not excluded by* the court, the motion must be treated as one for summary judgment under Rule 56," Fed. R. Civ. P. 12(d) (emphasis added). "Nevertheless, a district judge has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings . . . or to reject it or simply not consider it.'" *Sager*, 855 F. Supp. 2d at 542 (quoting 5C *Charles Alan Wright & Arthur R. Miller*, Federal Practice and Procedure § 1366, at 159 (3d ed. 2004)). Where, as here, the Court has not yet entered a scheduling order and Plaintiff has had no opportunity whatsoever to undertake any discovery, the Court is loath to force Plaintiff into a summary–judgment posture. *Cf. Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) ("Generally speaking, 'summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986))); *Minter v. Wells Fargo Bank*,

inferences in Plaintiff's favor, as the Court must, the Court concludes that the Complaint states a plausible claim for relief against the State Defendants.

### 1. The Complaint States a Valid Claim Against Both State Defendants

The State Defendants first suggest that Plaintiff's complaint must be dismissed because she does not allege that she is "a citizen of the United States or other person within the jurisdiction thereof." (State Def.'s Mot. to Dismiss, ECF No. 13-1 at 10.) They provide no support for the notion that a § 1983 claim must *explicitly plead* United States citizenship or personhood nor can the Court find any. Rather, "[i]t is axiomatic that 'in any § 1983 action the initial inquiry must focus on whether the two essential elements of a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 719 (4th Cir. 1991) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Plaintiff has plausibly alleged these essential elements.

The State Defendants attempt to turn the pleading standard on its head, focusing on the absence of magic words instead of the plausibility of the facts alleged. *See, e.g.*, *Twombly*, 550 U.S. at 555 (rejecting pleading standard based on a "formulaic recitation of the elements of a cause of action"). In any event, Plaintiff alleges that she is "a 29-year old citizen of El Salvador" and that Officer Farrelly detained her on "U.S. Route 40" in "Baltimore County" (i.e., she alleges that she was a person within the jurisdiction of the United States at the time Officer Farrelly allegedly violated her constitutional rights). (ECF No. 1 ¶¶ 2, 9, 16.)

---

*N.A.*, 593 F. Supp. 2d 788, 792 (D. Md. 2009) ("As a general rule, summary judgment is not appropriate prior to the completion of discovery."). Indeed, the documents included with the State Defendants' motions are not self-explanatory and, if anything, reveal the need for discovery. Accordingly, the Court will decline to exercise its discretion under Rule 12(d) and will instead evaluate the State Defendants' motion pursuant to Rule 12(b)(6), excising the attached exhibits from its consideration.

The State Defendants' next summarily suggest that, "as an undocumented/illegal immigrant, Plaintiff lacks standing to bring this lawsuit." (ECF No. 13-1 at 11.) Although they offer only a partial citation in support of this argument, the Court presumes that the State Defendants intended to rely on *Equal Access Educ. v. Merten*, 325 F. Supp. 2d 655 (E.D. Va. 2004). In *Merten*, the district court held that an illegal alien lacked standing to challenge state college admissions policies on the ground that those policies were preempted by federal law because the federal law at issue pertained only to *legal* aliens. *Id.* at 661. The court nowhere suggested the sweeping rule that the State Defendants appear to advocate for: that undocumented/illegal immigrants lack standing to bring suit ever. Indeed, in a prior opinion *in the same case* the district court held that, as "an object of the action . . . at issue," an illegal alien had standing to challenge the admissions policies themselves. Equal Access Educ. v. Merten, 305 F. Supp. 2d 585, 595 (E.D. Va. 2004) (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Moreover, the State Defendants' argument is directly at odds with the plain language of § 1983, which provides a cause of action to "any citizen of the United States *or other person*." 42 U.S.C. § 1983 (emphasis added); *see also Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 457 (4th Cir. 2013) (addressing § 1983 claim brought by illegal alien); *Cardenas v. Smith*, 733 F.2d 909, 913 (D.C. Cir. 1984) (noting that immigration status of plaintiff is generally not relevant to standing analysis because "it is the injury and not the party that determines Article III standing").

The State Defendants' causation argument is no more persuasive. They contend that because Plaintiff alleges her injury was caused, at least in part, by the Federal Defendants' policy of entering civil warrants of removal in the NCIC database, the State Defendants' could not have caused her injury. Section 1983 provides a cause of action to a person deprived of her

constitutional rights against any person who "subjects, or causes [her] to be subjected" to such deprivation. 42 U.S.C. § 1983. A defendant need not be the *sole* cause of the harm suffered by the plaintiff. Rather, a person may be held liable under § 1983 "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *see Skundor v. Coleman*, No. CIV.A. 5:02-0205, 2003 WL 22088342, at *9 (S.D.W. Va. July 31, 2003) (same), *report and recommendation adopted sub nom. Skundor v. McBride*, 280 F. Supp. 2d 524 (S.D.W. Va. 2003), *aff'd sub nom. Skundor v. Coleman*, 98 F. App'x 257 (4th Cir. 2004); *Salih v. Smith*, No. CIV. HAR 93-1556, 1994 WL 750529, at *3 (D. Md. Nov. 8, 1994) ("To sustain a cause of action against a defendant pursuant to § 1983, the defendant must have directed or *participated in* the alleged constitutional violation of the plaintiff's civil rights." (emphasis added) (citing *Rizzo v. Goode*, 423 U.S. 362, 370–71 (1976)). Here, it is undisputed that Officer Farrelly stopped Plaintiff's car, detained her, and ultimately arrested her. Plaintiff alleges that each of these actions violated her Fourth and Fifth Amendment rights. Regardless of any allegations she makes against the Federal Defendants, she has plausibly alleged that Officer Farrelly directly participated in the deprivation of her constitutional rights.

The same is true with respect to the Complaint's allegations against Baltimore County. Plaintiff alleges that, at the time she was detained, "Baltimore County supervisors and officials were aware that their police officers d[id] not have th[e] authority" to unilaterally stop and detain individuals based solely on suspected civil immigration violations. (ECF No. 1 ¶ 31.) The Complaint further alleges that the County failed to "provide specific training to Officer Farrelly or to any of his fellow patrol officers about the unlawfulness of stopping and arresting a person solely on suspicion of a civil immigration violation." (*Id.* ¶ 33.) And she contends that

Baltimore County's failure to train Officer Farrelly, "caused [her] unlawful detention." (*Id.* ¶ 53, 56.) Her allegations against the Federal Defendants do not undermine her claims against the County any more so than they do her claims against Officer Farrelly. Plaintiff has plausibly alleged that the State Defendants' failure to train Officer Farrelly caused her to be deprived of her constitutional rights—nothing more is required at this time.

### 2. Monell *Claim*

The State Defendants next argue that Plaintiff fails to state a claim against the County as a matter of law because the Complaint does not allege that the failure to train Officer Farrelly "amounted to deliberate indifference to rights of persons with whom police come into contact."[4] (ECF No. 13-1 at 13 (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).) The County also asserts that the *Monell* claim fails as a matter of fact because the County did in fact train Officer Farrelly regarding his authority (or lack thereof) to detain aliens suspected of civil immigration violations.[5] The Court concludes that the allegations in the Complaint, taken as true, state a plausible claim for *Monell* liability against Baltimore County.

"Under *Monell*, a municipality's liability 'arises only where the constitutionally offensive actions of employees are taken in furtherance of some municipal "policy or custom."'" *Walker v. Prince George's Cty.*, 575 F.3d 426, 431 (4th Cir. 2009) (quoting *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984); *see Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) ("Only in cases where the municipality causes the deprivation 'through an official policy

---

[4]      To the extent that the State Defendants merely take issue with Plaintiff's failure to include the phrase "deliberate indifference" in her Complaint, the Court rejects this argument for the same reasons stated *supra* with regard to their argument that Plaintiff failed to assert U.S. citizenship or personhood. In assessing a Rule 12(b)(6) motion the Court looks to the facial plausibility of the claim, not its "formulaic recitation" of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

[5]      The County attempts to refute the allegations in the Complaint regarding lack of training with exhibits attached to its motion to dismiss. As explained *supra*, the Court declines to consider these extraneous documents in resolving the State Defendants' motion pursuant to Rule 12(b)(6).

or custom' will liability attach." (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999))).

A policy or custom need not be express, however. Rather, it may present itself in one of several forms, including "through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens.'" *Lytle*, 326 F.3d at 471 (quoting *Carter*, 164 F.3d at 217); *see id.* at 473 ("Section 1983 liability may attach if officers are not adequately trained 'in relation to the tasks the particular officers must perform,' and this deficiency is 'closely related to the ultimate injury.'" (quoting *Canton*, 489 U.S. at 390–91)).

To impose liability on a municipality based on a failure to train, a plaintiff must plead (and ultimately prove) that: (1) an employee of the municipality violated the plaintiff's constitutional or statutory rights; (2) the municipality failed to train its employees, manifesting a "deliberate indifference" to the rights of citizens; and (3) the failure to train actually caused the employees to violate the plaintiff's rights. *See Canton*, 489 U.S. at 388–92; *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000).

A Plaintiff seeking to impose *Monell* liability based on a municipality's failure to train faces an uphill battle. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)); *Parrish v. Cleveland*, 372 F.3d 294, 302–03 (4th Cir. 2004) ("'Deliberate indifference is a very high standard . . . .'"; it requires a showing that "the official in question subjectively recognized a substantial risk of harm" and "subjectively recognized that his actions were 'inappropriate in light of that risk'" (first quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999), then quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997))). For this reason, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim

turns on a failure to train." *Connick*, 563 U.S. at 61. Generally, "a failure to train can only form a basis for liability if 'it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations.'" *Lytle*, 326 F.3d at 474 (quoting *Canton*, 489 U.S. at 397 (O'Connor, J., concurring in part and dissenting in part)); *see Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (quoting *Bryan Cty.*, 520 U.S. at 409)).

The Supreme Court, however, has opined that, "'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63 (quoting *Bryan Cty.*, 520 U.S. at 409). This so called "single incident" exception must be applied judiciously, however, to "avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability" arising from *Monell* claims. *Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010); *see Connick*, 563 U.S. at 70 (noting that in failure to train cases courts "must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into *respondeat superior*" (quoting *Bryan Cty.*, 520 U.S. at 406)). Thus, to prove deliberate indifference based on a single incident, a Plaintiff must show that the constitutional violation at issue was the "patently obvious" or "highly predictable" consequence of the municipality's failure to provide additional specified training. *Connick*, 563 U.S. at 64; *see Bryan Cty.*, 520 U.S. at 409 ("[A] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.").

Plaintiff does not allege a pattern of similar activity by Baltimore County, but instead relies on the single incident exception in support of her claim. Thus, Plaintiff faces a doubly

heightened standard: she must prove not only that the County was deliberately indifferent in failing to train Officer Farrelly, but that the consequence of that indifference was highly predictable. Put differently, she must show that the constitutional violation of which she complains was "*so* predictable that failing to train [Officer Farrelly] amounted to *conscious disregard* for [her] rights." *Connick*, 563 U.S. at 71. Plaintiff need not prove her claim now, however. Rather, she must only state a claim for relief against the County that is plausible on its face. *See, e.g.*, *Twombly*, 550 U.S. at 556 ("[A] well–pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."); *see also Parrish*, 372 F.3d at 303 (noting that deliberate indifference "is *a question of fact* subject to demonstration in the usual ways, including inference from circumstantial evidence" (emphasis added) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))).

Plaintiff has alleged specific facts that make her failure to train claim plausible. Plaintiff alleges that supervisors in the Baltimore County Police Department were informed that, pursuant to Supreme Court and Fourth Circuit precedent, local law enforcement officers do not have authority to unilaterally detain aliens based solely on a known or suspected violation of civil immigration law. She further alleges that officers were not trained regarding the limits on their authority to stop and arrest aliens based solely on suspicion of a civil immigration violation. In support, Plaintiff alleges that the field manual used by officers does not advise officers of their authority (or lack thereof) to detain individuals in such a situation. Rather, the manual instructs officers to call ICE after they have *already* arrested an alien.

Based on the foregoing, the Court concludes that the Complaint states a plausible claim for relief against Baltimore County. First, she alleges that the County was explicitly made aware of the risk of constitutional violations stemming from the detention of aliens. Second, she

alleges that, in spite of its awareness of this risk, the County took no action to train its officers regarding their authority in a very specific and likely circumstance: encountering an alien with a civil warrant of removal during the course of a routine investigatory detention. Third, she alleges that the County's failure to train Officer Farrelly caused him to detain her in violation of her Fourth Amendment rights. In making these allegations Plaintiff does not "rely upon scattershot accusations of unrelated constitutional violations" but instead contends that the County "was indifferent to the risk of *her specific injury*." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (emphasis added). She has alleged sufficient facts at this early juncture of the litigation to make out a plausible claim that Officer Farrelly was "not adequately trained 'in relation to the tasks that [he] must perform' and [that] this deficiency is 'closely related to [her] ultimate injury.'" *Lytle*, 326 F.3d at 473 (quoting *Canton*, 489 U.S. at 390–91).

Plaintiff has also plausibly alleged that the injury she suffered was a highly predictable consequence of the County's deliberate indifference. It is eminently plausible that an officer who discovers an outstanding civil warrant for an alien—in the very same database that officers routinely access to identify individuals subject to criminal arrest warrants—would believe he should detain and arrest the individual absent specific training to the contrary. Moreover, the field manual in fact could be read to implicitly encourage such a decision because it instructs officers to contact ICE only *after* they have already arrested alien. A reasonable factfinder could find that her injury was "a highly predictable consequence of [the County's] failure to equip [Officer Farrelly] with specific tools to handle [a] recurring situation[]." *Bryan Cty.*, 520 U.S. at 409. In other words, she has plausibly alleged that Baltimore County was deliberately indifferent to specific deficiencies in its training related to the detention of aliens, which made a constitutional violation of the kind suffered by Plaintiff a highly predictable consequence.

### 3. *Qualified Immunity*

Finally, the State Defendants argue that Officer Farrelly is entitled to qualified immunity because he did not violate Plaintiff's constitutional rights. "Qualified immunity 'protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."'" *Walker*, 575 F.3d at 429 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Claims of qualified immunity are subject to a two-prong analysis. *Id.* First, the Plaintiff must show the violation of a constitutional right. *Id.*; *see Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) ("The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred."); *accord Crawford–El v. Britton*, 523 U.S. 574, 588 (1998). Second, "the court must decide whether the right at issue was 'clearly established' at the time of [the] alleged misconduct." *Walker*, 575 F.3d at 429 (alteration in original) (quoting *Pearson*, 555 U.S. at 816). The defendant bears the ultimate "burden of proof and persuasion with respect to a defense of qualified immunity," including whether the right at issue was clearly established at the time of the purported violation. *Meyers v. Baltimore Cty.*, 713 F.3d 723, 731 (4th Cir. 2013); *see Henry*, 501 F.3d at 378 ("The defendant bears the burden of proof on the second question . . . ."); *accord Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). In conducting this analysis the Court adopts the Plaintiff's version of the facts and draws all reasonable inferences in her favor. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (stating that in qualified immunity cases courts generally must adopt plaintiff's version of facts). Moreover, the Court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### a. *Constitutional Violation*

The Court begins with the first prong—i.e., whether Plaintiff has plausibly alleged the violation of a constitutional right.  Plaintiff alleges that Officer Farrelly unreasonably seized her in violation of her Fourth Amendment rights and deprived her of equal protection in violation of her Fifth Amendment rights when he initially stopped her vehicle.  She further alleges that even if the initial stop was justified, Officer Farrelly unlawfully prolonged the stop solely to investigate her immigration status in violation of the Fourth Amendment.

### i. *Fourth Amendment*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A temporary detention such as a traffic stop "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."  *Whren v. United States*, 517 U.S. 806, 809–10 (1996).  Generally, for a stop to be reasonable under the Fourth Amendment, police must have "probable cause to believe that a traffic violation has occurred."  *Id.* at 810; *see also Santos*, 725 F.3d at 460 ("[A]rrests, the most intrusive type of police-citizen encounter, must be supported by probable cause.")

In *Terry v. Ohio*, 392 U.S. 1 (1968), however, the Supreme Court recognized "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause."  *Michigan v. Summers*, 452 U.S. 692, 698 (1981).  The Court engages in a "dual" inquiry when evaluating the reasonableness of a *Terry* stop:  (1) the stop must be "justified at its inception," and (2) it must be "reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20; *accord United States v. Palmer*, 820 F.3d 640, 648–49 (4th Cir.

2016).   The government bears the burden to "demonstrate that the seizure it seeks to justify . . . was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983).   A stop is justified at its inception "when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702 (1983); *Palmer*, 820 F.3d at 649 ("*Terry*'s first prong is satisfied 'whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.'" (quoting *Arizona v. Johnson*, 555 U.S. 323, 327 (2009))).

"Under *Terry*'s second prong, the seizure must be limited both in scope and duration." *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011), *as amended* (Aug. 2, 2011), *abrogated on other grounds by Rodriguez*, --- U.S. ----, 135 S. Ct. 1609 (2015).   "With regard to the scope component, 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'"   *Id.* (quoting *Royer*, 460 U.S. at 500).   With regard to duration, police may not prolong a traffic stop "beyond the time reasonably required to complete [its] mission," *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)—i.e., "to address the traffic violation that warranted the stop," *Rodriguez*, 135 S. Ct. at 1614.   *See Rodriguez*, 135 S. Ct. at 1614 ("Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" (alteration in original) (quoting *Royer*, 460 U.S. at 500)).   Although an officer "generally must focus his attention on the initial basis for the stop," he "may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Hill*, 852 F.3d 377, 382

(4th Cir. 2017) (quoting *Rodriguez*, 135 S.Ct. at 1615); *see also United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) ("If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle.").

Officers also may engage in investigative questioning *unrelated* to the underlying basis for the stop, so long as that questioning "does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention." *Digiovanni*, 650 F.3d at 507 (quoting *United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010)). In other words, an officer may not prolong a stop for reasons unrelated to the initial traffic infraction "unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." *Palmer*, 820 F.3d at 649–50; *accord Rodriguez*, 135 S. Ct. at 1615–16. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614. In short, a police officer "must diligently pursue the investigation of the justification for the stop to avoid running afoul of the duration component of *Terry*'s second prong." *Digiovanni*, 650 F.3d at 509 (citation omitted).

### ii.    Fifth Amendment

"[R]acially motivated law enforcement can violate the equal protection component of the Fifth Amendment's Due Process Clause." *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996). In order to establish a Fifth Amendment racially motivated law enforcement claim, Plaintiff must show that "the law enforcement practice 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Suarez*, 321 F. App'x 302, 305 (4th Cir. 2009) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). To establish a discriminatory effect, the Plaintiff "must show that the law enforcement practice was not

enforced against 'similarly situated individuals of a different race.'" *Id.* (quoting *Armstrong*, 517 U.S. at 465). Moreover, the Plaintiff "has the burden of proving 'the existence of purposeful discrimination.'" *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Officers are entitled to a presumption that they have not violated equal protection, and therefore the standard for proving such a claim is "a demanding one." *Armstrong*, 517 U.S. at 463.

### iii.     *Legality of Initial Stop*

Plaintiff contends that Officer Farrelly initially stopped her based solely on her Latina appearance in order to investigate her immigration status. This allegation potentially implicates her rights under both the Fourth and Fifth Amendment. Plaintiff alleges that, immediately before stopping her, Officer Farrelly observed her appearance while stopped adjacent to her vehicle at a red light. He subsequently signaled for her to pull over shortly after going through the light. After the stop, when she asked Officer Farrelly why he had pulled her over, he responded that "he had stopped her because she did not have insurance." (ECF No. 1 ¶23.) However, Plaintiff had valid insurance for the vehicle at the time of the stop. Indeed, Plaintiff alleges that Officer Farrelly questioned her during the stop solely about her family history and immigration status— not her insurance. Moreover, Officer Farrelly did not issue Plaintiff a citation for failure to provide proof of insurance or for any other traffic violation, and he ultimately arrested her based on her outstanding civil warrant of removal.

Plaintiff's allegations, taken as true, establish that Officer Farrelly's initial stop of her vehicle violated her Fourth and Fifth Amendment rights.[6] Plaintiff did not violate any traffic

---

[6]     The Court accepts Plaintiff's version of the facts and states them herein solely for purposes of resolving the State Defendants' motion to dismiss. As noted *supra*, the State Defendants attempted to refute several of Plaintiff's allegations, including through an affidavit submitted by Officer Farrelly that purports to provide an alternative justification for the initial stop. However, "a claim of immunity is conceptually distinct from the merits of the

laws prior to the stop. The sole purported justification for the stop—Plaintiff's lack of insurance—is refuted by Plaintiff's plausible claim that the vehicle was in fact insured and the lack of any citation issued by Officer Farrelly for an insurance violation. Based on these facts, Officer Farrelly lacked probable cause (or even reasonable suspicion) to justify the stop at its inception, and therefore Plaintiff has plausibly alleged an unreasonable seizure under the Fourth Amendment. Moreover, although Plaintiff faces an uphill battle in ultimately proving her Fifth Amendment equal protection claim, she has alleged a plausible claim of racially motivated law enforcement. Her plausible allegation that the vehicle was in fact insured supports her claim that Officer Farrelly's purported justification for the stop was merely pretextual. Thus, "taken in the light most favorable to [Plaintiff,] the party asserting the injury, . . . the facts alleged show [that Officer Farrelly's] conduct violated a constitutional right." *Wilson*, 337 F.3d at 397 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### iv. *Legality of Detention Following Initial Stop*

Plaintiff further contends that even if the initial stop had been justified (based on an insurance issue or some other traffic infraction), the scope and duration of the stop converted it into an unlawful seizure. Plaintiff alleges that Officer Farrelly initially took her identification to his patrol vehicle and remained there for approximately ten minutes. When Officer Farrelly

---

plaintiff's claim that his rights have been violated." *Mitchell v. Forsyth*, 472 U.S. 511, 527–28 (1985). Qualified immunity provides government officials with a robust shield against the burdens of litigation, but, when asserted at such an early stage in the litigation, before discovery has occurred, the Court must presume the truth of Plaintiff's allegations. *See, e.g.*, *DiMeglio v. Haines*, 45 F.3d 790, 798 (4th Cir. 1995) ("[A] court reviewing a qualified immunity defense should assess . . . whether the ***alleged conduct*** violated law clearly established at the time the conduct occurred." (emphasis added)); *cf. Scott*, 550 U.S. at 378 (stating that even at summary judgment stage court generally must adopt Plaintiff's version of the facts in qualified immunity cases); *Dolson v. Vill. of Washingtonville*, 382 F. Supp. 2d 598, 601 (S.D.N.Y. 2005) ("In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court indicated that the availability of qualified immunity ought to be decided by the Court at the earliest possible opportunity—preferably at the outset of the case, which is a point at which plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial."). Of course, Officer Farrelly may renew his claim of qualified immunity following discovery.

returned to Plaintiff's vehicle, he indicated that he had stopped her because she did not have insurance. After Plaintiff told officer Farrelly that she did have insurance he returned to his vehicle for another ten minutes. Subsequently, he again approached her and began to ask her questions regarding her immigration status, including "(a) whether she had ever had problems with the police or with immigration authorities, (b) whether she had any children, (c) the names of her parents and other family members, and (d) whether she had any tattoos." (ECF No. 1 ¶ 24.) At the conclusion of his questioning, Officer Farrelly arrested Plaintiff. In short, Plaintiff alleges that Officer Farrelly prolonged the stop solely to investigate her immigration status.

Assuming *arguendo* that Officer Farrelly lawfully stopped Plaintiff's vehicle because he had at least reasonable suspicion that she had committed a traffic violation, the Court must determine whether the scope and duration of the stop was reasonably related to this initial justification. The Court concludes that, based on the allegations in the Complaint, Officer Farrelly did not "diligently pursue the investigation of the justification for the stop," *Digiovanni*, 650 F.3d at 509—i.e., Plaintiff's lack of insurance. Indeed, the facts alleged indicate that Officer Farrelly "definitively abandoned the prosecution of the traffic stop" and instead "embarked on [a] sustained course of investigation" into Plaintiff's immigration status. *Id.* at 508–09 (quoting *United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010)) (finding that diligence was not present where unrelated questions "constituted the bulk of the interaction" between the police officer and the defendant). Officer Farrelly returned to his vehicle on two occasions during the stop yet he never completed a citation for the purported violation that justified the initial stop. Moreover, the stop lasted in excess of twenty minutes, yet Officer Farrelly never asked Plaintiff any questions regarding her insurance coverage. Rather, he unreasonably prolonged Plaintiff's detention solely to investigate her immigration status—an issue "completely unrelated to the

event that provided the justification for the stop in the first place." *Digiovanni*, 650 F.3d at 511. Based on these facts, "[Officer Farrelly] did not diligently pursue the traditional purposes of a traffic stop, i.e., investigating whether a traffic infraction occurred and issuing a ticket," *id.* at 510, and therefore the seizure was not "sufficiently limited in scope and duration to satisfy the [Fourth Amendment]." *Royer*, 460 U.S. at 500.

The duration of a stop must be judged in relation to its justified scope, bearing in mind that the Fourth Circuit has cautioned against "reduc[ing] the duration component to a bright-line rule." *Digiovanni*, 650 F.3d at 511. Thus, in many instances a delay of twenty or more minutes may well be reasonable, so long as the delay is closely related to the initial justification for the stop, or otherwise supported by reasonable suspicion. *See, e.g.*, *United States v. Mincey*, 321 F. App'x 233, 241–42 (4th Cir. 2008) (finding that stop that lasted thirty-five minutes was reasonable in order "to verify the information contained in the driver's license and rental agreement" provided to officer). However, where, as here, the sole reason for the stop lasting in excess of twenty minutes is wholly unrelated to the lawful purpose of the stop, diligence is <u>not</u> present. *See Digiovanni*, 650 F.3d at 510 (holding that traffic stop that lasted approximately fifteen minutes was converted into unlawful seizure because officer prolonged stop solely to investigate drug trafficking activity unrelated to basis for initial stop and not based on reasonable suspicion); *cf. Muehler v. Mena*, 544 U.S. 93, 101 (2005) (finding no Fourth Amendment violation where police officers asked occupant of house questions about her immigration status during lawful search of residence because questioning did not prolong detention incident to search); *Mason*, 628 F.3d at 132 (finding no Fourth Amendment violation where unrelated questioning during traffic stop caused *de minimis* delay of one to two minutes and entire stop lasted less than eleven minutes); *United States v. Jones*, 289 F. App'x 593, 599 (4th Cir. 2008)

(finding twenty minute stop reasonable where driver's failure to produce identification caused delay); *United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir. 2007) (finding that request for passenger identification did not prolong stop because "it occurred while the police trainee checked the driver's license and registration and prepared his citations"). Thus, even assuming the initial stop was justified, because the sole purpose for the prolonged duration of the stop was unrelated to the lawful justification for the stop, Plaintiff has alleged a violation of her Fourth Amendment rights.

### b. Clearly Established Law

Having concluded that the facts alleged establish that Officer Farrelly's conduct violated Plaintiff's constitutional rights, the Court next considers whether the specific rights at issue were "clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated th[ose] right[s]." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (quoting *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002)). In conducting this analysis, the Court is careful to define the right at issue narrowly. *See, e.g.*, *White v. Pauly*, --- U.S. ----, 137 S. Ct. 548, 552 (2017) (reaffirming "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality'" (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011))); *see id.* ("[T]he clearly established law must be 'particularized' to the facts of the case." (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))); *McKinney v. Richland Cty. Sheriff's Dep't*, 431 F.3d 415, 417 (4th Cir. 2005) ("In determining whether the right violated was 'clearly established,' we define the right in light of the specific context of the case, not as a broad general proposition." (quoting *Parrish*, 372 F.3d at 301)). Thus, in order to find that Officer Farrelly violated clearly established law, the Court must "identify a case where an officer acting under similar circumstances as [Officer Farrelly] was held to have violated the Fourth [or

Fifth] Amendment." *Pauly*, 137 S. Ct. at 552. That said, where the violation is "obvious," there need not be a factually analogous case in order for the right to be clearly established. *See, e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

Here, Officer Farrelly's initial stop of Plaintiff presents the rare "obvious" case that does not require a factual analogue. The facts alleged indicate that Officer Farrelly stopped Plaintiff's vehicle based solely on her race in order to investigate her immigration status. The Supreme Court has clearly stated that the Equal Protection Clause of the Fifth Amendment prohibits traffic stops based on race. *See Wren*, 517 U.S. at 813. Admittedly, *Wren* defines the right at a relatively "high level of generality." *al–Kidd*, 563 U.S. at 742. However, the Court believes that the right not to be seized solely on account of one's race is so fundamental that it would be clear to any objectively reasonable officer in Officer Farrelly's position. The same is true of Plaintiff's Fourth Amendment claim based on the initial stop. Based on the allegations in the Complaint, Officer Farrelly lacked probable cause or reasonable suspicion to make an investigatory stop. This claim, like Plaintiff's Fifth Amendment claim, is straightforward. A traffic stop, at a minimum, requires "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity," *Place*, 462 U.S. at 702, or has committed "a vehicular violation," *Palmer*, 820 F.3d at 649. Stopping a vehicle absent such reasonable suspicion violates clearly established law.

Officer Farrelly's prolonged detention of Plaintiff after the initial stop also violated clearly established law. The facts alleged indicate that Officer Farrelly violated Plaintiff's Fourth Amendment rights by unreasonably prolonging the stop solely to investigate her immigration status. In *Santos*, relying on the Supreme Court's decision in *Arizona v. United States*, the Fourth Circuit addressed a materially similar set of facts to the instant case and held

that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law." 725 F.3d at 465; *see Arizona v. United States*, 567 U.S. 387, 407 (2012) (noting that "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," and therefore "[i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent" (citation omitted)); *see Santos*, 725 F.3d at 465 (concluding that "because civil immigration violations are not criminal offenses, suspicion or knowledge that an individual has committed a civil immigration violation 'alone does not give rise to an inference that criminal activity is "afoot."'") (citation omitted). The parties agree that *Santos* (and *Arizona v. United States*) provide the relevant clearly established law for determining Officer Farrelly's entitlement to immunity.

In *Santos*, the plaintiff, a native of El Salvador, filed a § 1983 action alleging that two Frederick County Deputy Sheriffs violated her Fourth Amendment rights when they arrested her based on an outstanding civil warrant for removal issued by ICE. The officers initially approached the plaintiff while she was sitting in a parking lot behind the grocery store where she was employed. Although the encounter began as consensual, upon learning that the plaintiff had an outstanding civil warrant of removal, they detained her and ultimately arrested her. The entire encounter lasted approximately twenty minutes. Notably, in *Santos*, just as in the present case, there was no dispute "as to *whether* ICE directed the deputies to detain Santos at some point," but the "key issue" in the Fourth Circuit's view was "*when* ICE directed the deputies to detain her." *Santos*, 725 F.3d at 466. The court concluded that because the officers detained the

plaintiff based solely on the civil warrant *prior to* receiving any express direction or authorization from ICE to do so, her Fourth Amendment rights had been violated.

Here, Officer Farrelly prolonged his initial detention of Plaintiff based solely on her outstanding civil warrant of removal. The State Defendants contend that Officer Farrelly "complied with the 'clearly established' law described in . . . *Santos* because he . . . acted pursuant to the direction and authorization of federal statutes and officials." (ECF No. 13-1 at15–16.) But this conclusory assertion is unhelpful. Indeed, Plaintiff agrees that, at some point during her detention, Officer Farrelly contacted an ICE official who directed him to arrest her. The "key issue," however, is *when* that direction occurred. To the extent that Officer Farrelly prolonged Plaintiff's detention based solely on her civil warrant *and* prior to receiving direction to do so from ICE, he did not comply with *Santos*, and therefore he violated clearly established law. Plaintiff has plausibly alleged these very facts. Thus, Officer Farrelly is not entitled to qualified immunity.[7]

*     *     *

---

[7]    For the same reasons, the Court rejects the State Defendants' argument that Officer Farrelly was acting under color of federal—not state—law when he stopped and detained Plaintiff. Specifically, the State Defendants contend that Officer Farrelly was acting pursuant to 8 U.S.C. § 1357(g)(10), which allows state law enforcement officers to "cooperate" with the federal government in immigration enforcement. The Fourth Circuit rejected a similar argument in *Santos*. 725 F.3d at 466 ("*Arizona v. United States* makes clear that under Section 1357(g)(10) local law enforcement officers cannot arrest aliens for civil immigration violations absent, at a minimum, direction or authorization by federal officials."); *see Arizona v. United States*, 567 U.S. at 410 (stating that "no coherent understanding of ['cooperate' in Section 1357(g)(10)] would incorporate the *unilateral* decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government" (emphasis added)). Based on Plaintiff's allegations, Officer Farrelly unilaterally determined to prolong his detention of her after discovering the outstanding civil warrant of removal. Discovery may well reveal that Officer Farrelly in fact received direction from ICE before the duration of the stop became unreasonable. However, even this fact would not definitely establish that Officer Farrelly was acting pursuant to federal law. *Compare Arizona*, 567 U.S. at 410 (noting that examples of "cooperation" under § 1357(g)(10) "include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities"), *with United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014) (finding that detention was authorized under § 1357(g)(10) where officer "identif[ied] [driver], communicat[ed] with the Border Patrol, and detain[ed] [driver] until the Border Patrol agent could take custody"). In any event, the facts *currently before the Court* preclude a finding that Officer Farrelly was acting under color of federal law when he stopped and detained Plaintiff.

For the foregoing reasons, the State Defendants' motion to dismiss Counts 1 and 2 of the Complaint will be denied by an accompanying order.

**B.   *The State Defendants' Joint Representation***

The Court pauses briefly at this juncture to raise *sua sponte* a concern going forward. Officer Farrelly and Baltimore County are currently represented by the same counsel.  Up to this point in the litigation the Court does not believe that this joint representation has been detrimental to either of the State Defendants.  However, given that both State Defendants will remain in the case following disposition of this motion, it is incumbent upon the Court to identify and address any potential conflict before it manifests.

Attorneys practicing before this Court are of course obligated to comply with the Rules of Professional Conduct as they have been adopted by the Maryland Court of Appeals.  (Local Rule 704 (D. Md. 2016).)  Rule 19-301.7 of the Maryland Attorneys' Rules of Professional Conduct provides that

> (a)   Except as provided in section (b) of this Rule, an attorney shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:
>
> > (1)   the representation of one client will be directly adverse to another client; or
> >
> > (2)   there is a significant risk that the representation of one or more clients will be materially limited by the attorney's responsibilities to another client, a former client or a third person or by a personal interest of the attorney.
>
> (b)   Notwithstanding the existence of a conflict of interest under section (a) of this Rule, an attorney may represent a client if:
>
> > (1)   the attorney reasonably believes that the attorney will be able to provide competent and diligent representation to each affected client;
> >
> > (2)   the representation is not prohibited by law;

(3)    the representation does not involve the assertion of a claim by one client against another client represented by the attorney in the same litigation or other proceeding before a tribunal; and

(4)    each affected client gives informed consent, confirmed in writing.

Md. R. Attorneys, Rule 19-301.7.

The circumstances present in this case (or for that matter any § 1983 case seeking to impose liability against an individual officer and a municipality) are ripe for a potential conflict of interest between the State Defendants. *See, e.g.*, *Manganella v. Keyes*, 613 F. Supp. 795, 797 (D. Conn. 1985) ("An inherent conflict of interest arises in a § 1983 action when co-defendants in a suit are a local government and police officers or other employees in their individual capacity, as differing theories of liability and differing defenses are applicable to each defendant."). The Second Circuit has succinctly explained this conflict:

> A municipality may avoid liability by showing that the employee was not acting within the scope of his official duties, because his unofficial actions would not be pursuant to municipal policy. The employee, by contrast, may partially or completely avoid liability by showing that he was acting within the scope of his official duties. If he can show that his actions were pursuant to an official policy, he can at least shift part of his liability to the municipality. If he is successful in asserting a good faith immunity defense, the municipality may be wholly liable because it cannot assert the good faith immunity of its employees as a defense to a section 1983 action.

*Dunton v. Cty. of Suffolk*, 729 F.2d 903, 907, *amended on other grounds*, 748 F.2d 69 (2d Cir. 1984). The Second Circuit went on to broadly state that "[a]fter *Monell* the interests of a municipality and its employee as defendants in a section 1983 action *are in conflict*." *Id.* (emphasis added). It has since backed away from this sweeping statement, however, and a number of other federal courts of appeal have disavowed a *per se* rule against joint representation in § 1983 cases, instead emphasizing the case-by-case nature of a potential

conflict of interest.[8]  *See Chavez v. New Mexico*, 397 F.3d 826 (10th Cir. 2005); *Coleman v. Smith*, 814 F.2d 1142 (7th Cir. 1987).

Here, it is in Officer Farrelly's interest to contend that, at all relevant times, he was acting within the scope of his official duties.  Conversely, it is in the County's interest to contend that Officer Farrelly was acting outside the scope of his employment and authority or otherwise contrary to his training.  Indeed, the State Defendants come close to making this very argument in their motion to dismiss when they contend that the County did in fact train Officer Farrelly regarding his authority to detain aliens on civil immigration violations pursuant to the Fourth Circuit's decision in *Santos*.  The State Defendants, however, maintain that Officer Farrelly in fact complied with the directive of *Santos* (based on his purported training) and therefore avoid advancing a position materially adverse to Officer Farrelly's interests.

The Court believes that, moving forward, there is a "significant risk" that the County Attorney's representation of Officer Farrelly will be "materially limited" by his responsibilities to Baltimore County, and vice versa.  This of course does not *automatically* preclude his continued representation of both parties.  Rather, it requires that counsel for the State Defendants show he is in compliance with the directives in subsection (b) of Rule 19-301.7.  The Court has serious doubts as to whether counsel can make such a showing given the circumstances.  Accordingly, counsel for the State Defendants will be ordered to file a motion within thirty days of the entry of this memorandum and order confirming his compliance with Rule 19-301.7 or, in the alternative, stating why no such conflict exists.  The motion shall be accompanied by affidavits from Baltimore County and Officer Farrelly giving informed consent to their continued

---

[8]    The Fourth Circuit does not appear to have addressed this issue.  Indeed, even the Second Circuit in *Dunton*, somewhat contradictorily, denied that it was creating a per se rule against joint representation in § 1983 cases.  729 F.2d at 908 n.4 ("We need not create here a *per se* rule that disqualification is automatic in conflicts of this nature, although considering the overall responsibility of the court to supervise the ethical conduct of the Bar, such a rule might indeed be appropriate." (citation omitted)).

joint representation as well as an affidavit from the State Defendant's counsel confirming his compliance with all material requirements of subsection (b) of Rule 19-307.1.

### C.   *The Federal Defendants' Motion to Dismiss*

Plaintiff asserts three claims against the Federal Defendants.  In Counts 3 and 4, she seeks declaratory and injunctive relief, arguing that the Federal Defendants entry and maintenance of her civil warrant of removal in the NCIC database exceeds their statutory authority and caused her unlawful seizure.  Furthermore, she claims that the entry and maintenance of her information in the NCIC database puts her in imminent danger of being subjected to an unreasonable seizure in the future.  She also seeks monetary relief against the United States pursuant to the Federal Tort Claims Act ("FTCA"), alleging that the entry and maintenance of her civil warrant of removal in the NCIC database caused her to be tortiously arrested and imprisoned.

The Federal Defendants move to dismiss all of her claims.  First, pursuant to Rule 12(b)(1), they contend that the Court lacks subject matter jurisdiction because 8 U.S.C. § 1252(g) presents a jurisdictional bar to all of her claims.  Second, they contend that Plaintiff lacks standing to bring Counts 3 and 4 because she cannot satisfy the injury and causation requirements for Article III standing.  Finally, they contend that, even if the Court has jurisdiction, Plaintiff fails to state a claim as a matter of law under Rule 12(b)(6) because the Federal Defendants are in fact authorized to enter and maintain civil warrants of removal in the NCIC database.[9]

---

[9]      The Federal Defendants also argue that they are entitled to sovereign immunity for all of Plaintiff's claims. Because the Court concludes that Plaintiff's claims are barred by other non-merits grounds it need not address the Federal Defendants' sovereign immunity arguments. *See, e.g.*, *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999))).

The Court agrees with the Federal Defendants assertion that § 1252(g) strips the Court of jurisdiction over Plaintiff's FTCA claim. Moreover, because Plaintiff's civil warrant of removal was removed from the NCIC database a full two years before she filed the instant action, she lacks standing to bring Counts 3 and 4, which depend entirely on the Court's power to award prospective relief for an imminent injury. However, as explained *infra*, the Court will provide Plaintiff an opportunity to supplement her allegations with particularized facts (including affidavits and documentary evidence) in support of her contention that the Federal Defendants continue to maintain a civil warrant of removal against her in the NCIC database.

### 1. *Section 1252(g)'s Jurisdictional Bar*

The Immigration and Nationality Act ("INA"), as amended by section 306(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-612, and section 106(a)(3) of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, 311 provides that:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). The Supreme Court has interpreted this jurisdiction stripping provision narrowly, finding that it "applies only to three discrete actions that the Attorney General may take: [the] 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)); *cf. Selgeka v. Carroll*, 184 F.3d 337, 341 (4th Cir. 1999) (noting that in *AADC* the Supreme Court "significantly narrow[ed] the coverage of section 1252(g)").

By contrast, the Court noted that, among others, claims arising from decisions "to open an investigation, [or] to surveil the suspected violator," are within the jurisdiction of district courts. *AADC*, 525 U.S. at 482. Although § 1252(g) applies only to a narrow set of decisions or actions by the government, it imposes an *absolute* bar to federal court jurisdiction over any claim arising from such a decision or action. *See, e.g.*, *Guardado v. United States*, 744 F. Supp. 2d 482, 488 (E.D. Va. 2010) ("[W]here a claim arises from one of the three distinct actions identified in *AADC*, the subject matter jurisdiction question is over.").

The Federal Defendants contend that all of the conduct about which Plaintiff complains (i.e., entering and maintaining Plaintiff's outstanding civil warrant in the NCIC database and requesting that Officer Farrelly arrest Plaintiff based on that warrant) arose from decisions or actions to *execute* a removal order. The Court agrees that the decision to arrest Plaintiff (and the request that Officer Farrelly do so) constitutes a decision or action to execute a removal order. Therefore, the Court lacks subject matter jurisdiction over Plaintiff's FTCA claim, which arises directly from her arrest and imprisonment. The Court, however, disagrees with the Federal Defendants' contention that the decision to *enter in the NCIC database* Plaintiff's civil warrant of removal constituted a decision to *execute* a removal order. Therefore, her claims for injunctive and declaratory relief which arise from that decision are not barred by § 1252(g).

Plaintiff's FTCA claim for false arrest and imprisonment plainly arises from the Federal Defendants' decision to execute the order of removal against her. Here, it is undisputed that Plaintiff was subject to a final order of removal at the time of her arrest. Furthermore, both parties agree that Officer Farrelly arrested Plaintiff at the request of ICE based solely on her outstanding warrant of removal. Pursuant to 8 U.S.C. § 1231, when an alien is subject to a final order of removal, "the Attorney General shall remove the alien from the United States within a

period of 90 days." 8 U.S.C. § 1231(a)(1)(A). That section further provides that "the Attorney General shall detain the alien." 8 U.S.C. § 1231(a)(2). Plaintiff's claim that she was tortiously arrested and imprisoned is directly related to and arises from the Federal Defendants' decision or action to execute the final order of removal against her pursuant to the directive of § 1231. Put differently, Plaintiff seeks to hold the government liable for the Federal Defendants' decision to arrest her based on a final order of removability—this claim falls squarely within the jurisdictional bar of § 1252(g). *See Silva v. United States*, 866 F.3d 938, 940 (8th Cir. 2017) (finding that § 1252(g) barred FTCA claim stemming from arrest pursuant to removal order); *Guardado*, 744 F. Supp. 2d at 488 (finding that § 1252(g) barred FTCA false imprisonment claim stemming from arrest pursuant to removal order); *Kareva v. United States*, 9 F. Supp. 3d 838, 844–45 (S.D. Ohio 2014) (same); *Alcaraz v. United States*, No. C-13-511 MMC, 2013 WL 4647560, at *2 (N.D. Cal. Aug. 29, 2013) (finding that FTCA false arrest and imprisonment claim "plainly arises from the decision to execute [a] removal order" and therefore is barred by § 1252(g)); *cf. Polanco v. United States*, 10 CV 1705, 2014 WL 795659, *2 (E.D.N.Y. Feb. 27, 2014) (finding that § 1252(g) did not bar FTCA false arrest and imprisonment claim against DHS agents who arrested lawfully present alien after they were unable to locate his immigration record); *De La Paz v. Coy*, 954 F. Supp. 2d 532, 545 (W.D. Tex. 2013) (finding that § 1252(g) did not bar FTCA false imprisonment and assault claims arising from traffic stop where alien, although in the country illegally, had no immigration record and deportation proceedings were commenced only *after* arrest), *rev'd in part on other grounds*, 786 F.3d 367 (5th Cir. 2015).

Plaintiff's claims regarding the Federal Defendants' decision to enter her civil warrant in the NCIC database do not arise from a decision or action to execute a removal order. Plaintiff's claim arose when the Federal Defendants entered her civil warrant of removal in the NCIC

database. Nothing about that decision or action could be said to constitute *execution* of a removal order. The Federal Defendants broad reading of § 1252(g) is directly at odds with the "narrow reading," *AADC*, 525 U.S. at 487, given to that same section by the Supreme Court. Under the Federal Defendants' interpretation, any decision or action that could reasonably be construed to aid in the eventual execution of a removal order, would itself qualify as execution of the order. But § 1252(g) bars only those claims that arise from "three *discrete* events along the road to deportation." *Id.* at 482 (emphasis added). Indeed, the decision to enter a civil warrant of removal in the NCIC database is analogous to the decision to "surveil [a] suspected violator," *id.*, an example cited by the Supreme Court as outside the proscription of § 1252(g). Both decisions may be useful to federal immigration officials in the deportation process, but neither in and of itself constitutes execution of a removal order.

The facts of this case highlight why entry of a warrant in a database does not qualify as execution of the underlying order. Plaintiff's civil warrant of removal was not self-executing, and therefore the decision to enter it in the NCIC database was many steps removed from the execution of the underlying order. Here, the decision to execute that order occurred when the ICE official contacted by Officer Farrelly requested that he arrest Plaintiff. But prior to that ultimate decision a number of other decisions and actions had to occur: Officer Farrelly had to stop Plaintiff's vehicle, search the NCIC database, detain Plaintiff based on discovery of the civil warrant, contact ICE for direction, and ultimately receive explicit direction from ICE to execute the warrant. Each of these steps provided a potential off ramp, which, had it been taken, would have forestalled execution of the order. Thus, the Court concludes that Counts 3 and 4 are not barred by § 1252(g).

### 2.    *Plaintiff's Standing*

The Federal Defendants contend that, even if not barred by § 1252(g), the Court lacks subject matter jurisdiction over Counts 3 and 4 because Plaintiff does not have standing to assert these claims.  Based on the current record before it, the Court agrees.

A plaintiff's standing to sue in federal court is "an integral component of the case or controversy requirement" of Article III.  *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006).  To have Article III standing, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "As the party invoking federal jurisdiction, [Plaintiff] bears the burden of establishing these elements."  *McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010).

The standing requirements for declaratory relief and injunctive relief are essentially the same.  *Levinson–Roth v. Parries*, 872 F. Supp. 1439, 1446 (D. Md. 1995); *see also Miller v. Augusta Mut. Ins. Co.*, 157 F. App'x 632, 637 (4th Cir. 2005) ("A declaratory judgment may be issued only if the Article III case-or-controversy requirements are satisfied.").  A plaintiff who seeks either form of relief must show that she is in danger of being injured by the opposing party's conduct and that the danger is both "real" and "immediate" and neither "conjectural" nor "hypothetical."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Importantly, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *see McBurney*, 616 F.3d at 410–11 (holding that "to

maintain standing for declaratory and injunctive relief" a plaintiff must "plead an[] ongoing

injury"); *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) ("To obtain

*prospective* relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter*

*alia*, 'a sufficient likelihood that he [or she] will again be wronged in a similar way.'" (alteration

in original) (quoting *Lyons*, 461 U.S. at 111)).

Generally, when ruling on a motion to dismiss for lack of standing, "courts must accept

as true all material allegations of the complaint, and must construe the complaint in favor of the

complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). However, because "standing

implicates th[e] court's subject matter jurisdiction," *Long Term Care Partners, LLC v. United*

*States*, 516 F.3d 225, 230 (4th Cir. 2008), the Court may consider evidence outside the pleadings

without converting the motion to dismiss into one for summary judgment.[10] *See, e.g.*, *In re KBR,*

*Inc.*, 744 F.3d 326, 333 (4th Cir. 2014) ("[W]hen a defendant challenges subject matter

jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as

---

[10]     A motion under Federal Rule of Civil Procedure 12(b)(1) challenging a court's subject-matter jurisdiction may proceed "in one of two ways." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "First, the defendant may contend 'that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based.'" *Id.* (quoting *Adams*, 697 F.2d at 1219). Alternatively, "the defendant can contend . . . 'that the jurisdictional allegations of the complaint [are] not true.'" *Id.* (alteration in original) (quoting *Adams*, 697 F.2d at 1219). The first case represents a "facial" challenge, where the plaintiff enjoys "the same procedural protection as . . . under a Rule 12(b)(6) consideration," and the second presents a "factual" challenge, where a trial court may go beyond the complaint without converting the motion to one for summary judgment. *Id.* A court may also raise this issue *sua sponte* and must dismiss the action if it determines that it lacks subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006).

    In their motion to dismiss, the Federal Defendants initially contend that they are raising a facial challenge to the Court's subject matter jurisdiction. (*See* ECF No. 28 at 10 ("[T]he Federal Defendants assert that, even assuming the truth of Plaintiff's factual allegations, she has not established subject-matter jurisdiction.").) However, in their reply brief, the Federal Defendants shift course and contest one of Plaintiff's material allegations related to her standing to sue. The information proffered by the Federal Defendants bears directly on Plaintiff's standing to bring Counts 3 and 4, and therefore must be considered in resolving the instant challenge to the Court's subject matter jurisdiction. *See, e.g.*, *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997) (holding that, even where party only raises facial challenge to standing, court is "entitled at any time *sua sponte* to delve into the issue of whether there is a factual basis to support . . . subject matter jurisdiction"); *cf. Allstate Ins. Co. v. Adkins*, 932 F.2d 963, 1991 WL 77673, at *3 (4th Cir. May 15, 1991) ("It is axiomatic in our legal system . . . that standing concerns must be brought out by a court at any time during a proceeding.") (unpublished table decision); *Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1223 (4th Cir. 1980) ("[W]hether raised or not, jurisdictional standing is an issue to be considered sua sponte by the court.").

mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)); *see also Trinity Outdoor, L.L.C. v. City of Rockville*, 123 F. App'x 101, 105 (4th Cir. 2005) ("[I]n assessing a question of standing, a district court 'may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.' The elements of standing are then subjected to the same degree of proof that governs other contested factual issues." (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768–69 (4th Cir. 1991))).

The Federal Defendants contend, with supporting evidence, that Plaintiff's information was "cleared" from the NCIC database on September 11, 2014, and therefore she cannot show that she is in real and imminent danger of future injury. (ECF No. 32 at 7 n.7.) Plaintiff seeks only prospective declaratory and injunctive relief in Counts 3 and 4. She alleges that such prospective relief is necessary because the Federal Defendants' entry and maintenance of her civil warrant in the NCIC database places her "at imminent risk of suffering an unlawful seizure by state or local law enforcement officials in the future." (ECF No. 1 ¶¶ 59, 62.) According to the Federal Defendants, however, Plaintiff's information was removed from the NCIC database more than two years *before* she filed her complaint. If this is true—and, based on the current record, the Court has no reason to believe otherwise—Plaintiff's purported injury is neither real nor imminent. Moreover, the Court can provide no redress because the Federal Defendants contend they have already removed Plaintiff's information from the NCIC database, which obviates the need for the injunctive relief she seeks. Similarly, the Court cannot provide declaratory relief because Plaintiff has not plausibly alleged that she "will again be wronged in a

similar way."[11] *Lyons*, 461 U.S. at 111; *see Comite de Apoyo a los Trabajadores Agricolas v. U.S. Dep't of Labor*, 995 F.2d 510, 513 (4th Cir. 1993) ("By itself, a declaratory judgment cannot be the redress that satisfies the third standing prong. Rather, plaintiffs must identify some further concrete relief that will likely result from the declaratory judgment."); *Nat'l Ass'n of Home Builders v. E.P.A.*, 786 F.3d 34, 40 (D.C. Cir. 2015) (noting that plaintiff who "seek[s] only declaratory relief" "must allege ongoing or imminent injury").[12] Simply put, absent any ongoing injury, Plaintiff is not entitled to declaratory or injunctive relief. *See, e.g.*, *McBurney*, 616 F.3d at 410–11.

Here, the Court is faced with a difficult dilemma, however. The Federal Defendants have provided evidence that clearly vitiates Plaintiff's standing. This evidence is particularly persuasive, if not dispositive, given that Plaintiff's allegation that the Federal Defendants "continue[] to maintain the civil administrative warrant of arrest or order of removal against [her] in the NCIC database" is based solely "[o]n information and belief." (ECF No. 1 ¶ 37.) That said, the Federal Defendants did not contest this allegation until their reply brief, thereby depriving Plaintiff of any opportunity to refute their factual challenge to her standing. In such a situation, "it is within the . . . court's power to allow or to require the plaintiff to supply, by

---

[11] In Count 3, Plaintiff contends that the Federal Defendants entry and maintenance of her civil warrant in the NCIC database caused her to be unreasonably seized in violation of the Fourth Amendment. This past harm, however, cannot serve as the basis for the declaratory relief she seeks. *See, e.g.*, *McBurney*, 616 F.3d at 410–11 (holding that "to maintain standing for declaratory and injunctive relief" a plaintiff must "plead an[] ongoing injury").

[12] The Supreme Court has noted in a line of cases that where a plaintiff "challenges both a specific action and the policy that underlies that action, the challenge to the policy is not *necessarily* mooted merely because the challenge to the particular action is moot." *Harry T. Edwards & Linda A. Elliott*, Federal Standards of Review— Review of District Court Decisions and Agency Actions 115–16 (2007) (emphasis added). However, the plaintiff still must maintain a sufficiently concrete personal stake in the case to challenge the underlying policy. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("We know of no precedent for the proposition that . . . a plaintiff . . . retains standing to challenge the basis for [a particular] action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to *his* interests." (emphasis added)). Here, Plaintiff has not plausibly alleged any "concrete application" of the Federal Defendants' policy that "threatens imminent harm to [her] interests." *Id*.

amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth*, 422 U.S. at 501. Therefore, the Court grants Plaintiff ten days from the entry of this order to provide such "further particularized allegations" in support of her contention that the Federal Defendants continue to maintain a civil warrant of removal for her in the NCIC database. Plaintiff's allegations and supporting evidence, if any, must pass muster under *Iqbal/Twombly* and must be sufficient to overcome the Federal Defendants' evidence to the contrary. If, after this opportunity, Plaintiff's standing "does not adequately appear from all materials of record," *id.* at 502, the Federal Defendants' motion to dismiss Counts 3 and 4 for lack of subject matter jurisdiction will be granted.

## V. Conclusion

For the foregoing reasons, the State Defendants' Motion to Dismiss or for Summary Judgment (ECF No. 13) will be DENIED and the Federal Defendants' Motion to Dismiss (ECF No. 28) will be GRANTED IN PART and HELD IN ABEYANCE IN PART.

DATED this 19th day of September, 2017.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge